# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

JOSE SHOMO, a/k/a Jose J. Shomo,

                                        Plaintiff,

                                                        9:15-CV-01029
       v.                                               (GLS/ATB)

STATE OF NEW YORK DEPARTMENT
OF CORRECTIONS AND COMMUNITY
SUPERVISION, et al.,

                                        Defendants.

JOSE SHOMO, Plaintiff, pro se
MICHAEL G. MCCARTIN, Asst. Attorney General for Defendants

ANDREW T. BAXTER
United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the

Honorable Gary L. Sharpe, United States District Judge.  Presently before the court is

defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No.

132).  Plaintiff responded in opposition to the motion, and defendants filed a reply.

(Dkt. Nos. 142, 143, 144).  Plaintiff then filed a sur-reply.  (Dkt. No. 150).  For the

reasons set forth below, this court will recommend granting defendants' motion and

dismissing the amended complaint.

## BACKGROUND

### I.    Procedural History

On August 25, 2015, plaintiff commenced this action against the State of New

York Department of Corrections and Community Supervision ("DOCCS") and Corision

Health Services ("Corision") by filing a pro se complaint pursuant to 42 U.S.C. § 1983 ("Section 1983"); Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq*.; and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794 et seq.  (Dkt. No. 1).  At the same time, plaintiff filed a motion to proceed in forma pauperis ("IFP"). (Dkt. No. 2). On November 18, 2015, Judge Sharpe issued an order in which he granted plaintiff's motion for IFP; dismissed the access-to-courts claims, as well as the ADA and Rehabilitation Act claims against Corision, without prejudice; and ordered that a response to plaintiff's ADA and Rehabilitation Act claims against DOCCS be filed by the defendants.  (Dkt. No. 9).

After some discovery and various preliminary proceedings, plaintiff filed a motion to serve an amended complaint on March 29, 2018, which defendants opposed. (Dkt. No. 78, 79).  On June 18, 2018, this court issued an order granting plaintiff's motion in part and denying it in part.  (Dkt. No. 81).  Specifically, the motion to amend was granted to the extent that plaintiff was permitted to proceed on the following claims:

> (1)  First Amendment access-to-courts claims against Superintendents William J. Connolly and Daniel Martuscello; and
>
> (2)  ADA and Rehabilitation Act claims for money damages against DOCCS.

(Dkt. No. 81 at 25).  Now, upon completion of discovery, defendants bring the instant motion for summary judgment seeking dismissal of the amended complaint.  (Dkt. No. 132).

2

## II.    Relevant Facts and Contentions

Detailed summaries of plaintiff's allegations were included in Judge Sharpe's November 18, 2015 order and my June 18, 2018 order. (Dkt. Nos. 9 at 4-6; 81 at 6-11). This court will provide a brief summary of the facts and contentions relevant to the issues raised in defendants' pending motion.

Plaintiff is currently serving a term of 25 years to life for his 2000 felony convictions of murder and criminal possession of a weapon. (Dkt. No. 132-3 at 7). Plaintiff alleges that prior to, and at the time of, his September 1999 arrest for these crimes, he suffered from a neurological condition[1] causing him to have no use of his right arm and very limited use of his left hand and arm. (Dkt. No. 143 at 1). Plaintiff further alleges that he subsequently lost any remaining use of his left arm.[2] Thus, plaintiff contends that he has not been able to use either of his upper extremities since 1999. (*Id.* at 2).

Plaintiff claims that since being received into DOCCS custody in 2001, he has "only been housed in . . . one of DOCCS's Regional Medical Units (RMU), infirmar[ies] or other specialized units for persons with disabilities or medical [limitations] who were unable to be program[m]ed." (*Id.*).

---

[1] Plaintiff contends that these injuries stem from an October 24, 1994 incident at Riker's Correctional Facility, where he was previously incarcerated for a separate offense. (Dkt. No. 132-3 at 45-50). Allegedly, plaintiff was in his cell reaching down for some personal items when he came into contact with exposed wires, causing him to become electrocuted and thrown backwards, thereby sustaining the claimed injuries. (*Id.*).

[2] According to plaintiff, the second injury to his left arm occurred as a result of being handcuffed to another prisoner on September 7, 1999, while in DOCCS custody. (Dkt. No. 143 at 2) (citing *Shomo v. City of N.Y.*, 579 F. 3d. 176, 183 (2d Cir. 2009).

Based on plaintiff's allegations, and as relevant to the instant motion, he was confined at Fishkill Correctional Facility ("Fishkill C.F.") from May 2012 through December 2013, and at Coxsackie Correctional Facility ("Coxsackie C.F.") from December 2013 through 2015. Specifically, plaintiff was transferred to Fishkill C.F. on May 29, 2012. (Dkt. No. 82 at 47). Plaintiff claims that, upon arrival to Fishkill C.F., he was initially provided assistance with all activities of daily living ("ADL"). (*Id.*). However, on or about July 31, 2012, the nursing staff suddenly refused to assist plaintiff with accessing his legal papers. (Dkt. No. 132-3 at 17). On August 3, 2012, defendant Connolly issued a memorandum to plaintiff indicating that, as a result of plaintiff's disciplinary issues since arriving to Fishkill C.F.,[3] the "extra privileges" previously made available to plaintiff were effectively rescinded. (Dkt. No. 132-5). This included, among other things, the provision of a "scribe" to assist plaintiff with correspondence and legal work. (*Id.*). Defendant Connolly expressed that paper and pen would still be provided to plaintiff. (*Id.*). Plaintiff contends that for the remainder of his custody at Fishkill C.F., he was denied the assistance of a scribe.

Plaintiff was then transferred from Fishkill C.F. to Coxsackie C.F. on or about December 2, 2013. (Dkt. No. 82 at 36-37). Although not clearly set forth by the plaintiff, it appears that he continued to be denied the assistance of a scribe upon his

---

[3]Submitted with defendants' motion papers is a copy of plaintiff's Inmate Disciplinary History, indicating that plaintiff was found guilty of three Tier 2 offenses in the little over two months between his transfer to Fishkill C.F. and the date of Superintendent Connolly's memorandum. (Dkt. No. 132-8). The Inmate Disciplinary History further reveals that, between February 2003 and August 2018, plaintiff was charged with 70 different Tier 2 and Tier 3 offenses, for almost all of which he was found guilty. (*Id.*).

initial transfer to Coxsackie C.F.  (Dkt. 82 at 47).  However, on May 15, 2014,

Coxsackie C.F. superintendent Daniel Martuscello "approved plaintiff to receive

'minimum' assistance from an inmate 'scribe,' however the scribe was '[s]trictly

[p]rohibited' from either filing or writing any institutional grievances or writing any

form of legal papers[.]" (Dkt. Nos. 82 at 47; 132-3 at 55-57, 70, 73-74).  Plaintiff was

permitted assistance from a scribe to write correspondence to potential legal counsel.

(Dkt. No. 132-3 at 74-76).  In August 2015, Superintendent Martuscello gave plaintiff

"permission" to file the original complaint in the instant case, with the qualification that

plaintiff could not personally name any DOCCS staff, and could only seek injunctive

relief.  (Dkt. No. 82 at 47).  Plaintiff alleges that the original complaint was further

subject to review by a corrections officer, to confirm that DOCCS staff were not

personally named. (*Id.*).

Plaintiff was transferred out of Coxsackie C.F. to Wende C.F. in 2015.  (Dkt. No.

132-8 at 4).

## DISCUSSION

### III.    Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material

fact and, based on the undisputed facts, the moving party is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir.

2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment."

*Anderson v. Liberty Lobby*, *Inc.,* 477 U.S. 242, 248 (1986).  It must be apparent that no

rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## IV.    Access to Courts

### A.    Legal Standards

The United States Constitution guarantees prisoners a "meaningful right of access to the courts." *Bounds v. Smith*, 430 U.S. 817, 830 (1977). As the Supreme Court explained in *Bounds*, this right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828. However, "*Bounds* did not create an abstract, freestanding right to a law library or legal

assistance," nor did it "guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." *Lewis v. Casey*, 518 U.S. 343, 351 (1996). Instead, "the Constitution guarantees only the tools that 'inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.'" *Collins v. Goord,* 438 Supp. 2d 399, 415–16 (S.D.N.Y. 2006) (quoting *Lewis*, 518 U.S. at 355). "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.*

The courts have recognized two variants of claims for denial of access to courts: first, "forward-looking claims," where "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," and second, "backward-looking access claims," which cover "specific cases that cannot now be tried (or tried with all material evidence)" due to the actions of state officials. *Jean-Laurent v. Lawrence,* No. 12-CV-1502, 2015 WL 1208318, at *3 (S.D.N.Y. Mar. 17, 2015) (citing *Christopher v. Harbury*, 536 U.S. 403, 413–14 & n. 11 (2002)). "The Second Circuit has emphasized, however, that the viability of [backward-looking] claims is far from clear, pointing out that the [Supreme Court's] *Harbury* decision was careful not to endorse their validity." *Id. (*quoting *McNaughton v. de Blasio*, No. 14 Civ. 221, 2015 WL 468890, at *12 (S.D.N.Y. Feb. 4, 2015) (other citations omitted). Although the availability of a backward-looking access claim remains uncertain in this Circuit (*see Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012) ("The viability of backward-

looking right-of-access claims is far from clear in this Circuit . . .")), the existing case law suggests four elements:

> First, the plaintiff must identify a nonfrivolous, arguable underlying claim.  Second, the plaintiff must establish that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim.  Third, the plaintiff must show that the defendant's alleged conduct was deliberate and malicious[4].  Fourth, the plaintiff must demonstrate that the defendant's actions resulted in an actual injury to the plaintiff.

*Jean-Laurent v. Lawrence,* 2015 WL 1208318, at *4 (internal citations and quotations omitted).  What does remain clear is that such denial-of-access claims are "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Harbury*, 536 U.S. at 415; *see also Sousa*, 702 F.3d at 128 (citation omitted).

**B.   Application**

Plaintiff's surviving First Amendment claims allege that defendants Connolly and Martuscello deprived him of access to the courts by denying him a scribe assistant.[5]

---

[4]*But see Desmarat v. Artus,* Civ. No. 08 Civ. 977 (DNH/RFT), 2011 WL 1564605, at *7 (N.D.N.Y. Mar. 25, 2011) (questioning whether 'maliciousness' is a proper element of a backward-looking access to court claim, based on Second Circuit jurisprudence).

[5]Plaintiff's complaint also alleges a general claim for denial of access to the law library. (Dkt. No. 82 at 46-47).  However, the pleadings lack sufficient factual detail surrounding this claim, including the actual harm resulting from his lack of law library access or how the defendants were personally involved in such deprivation. *See Fowler v. Dep't of Corr.*, No. 3:17-CV-00848, 2017 WL 3401252, at *7 (D. Conn. 2017) (dismissing access-to-courts claim for lack of sufficiently detailed description of underlying court case and how it was impeded by denial of access to prison law library books).  Moreover, plaintiff's general complaint that the four hours a week he was allowed access to the law library violated his constitutional rights is unavailing. *Bilal v. New York State. Dep't of Corrections,* No. 09 Civ. 8433, 2010 WL 2506988, at *13 (S.D.N.Y. June 21, 2010) (citing inter alia *Penrod v. Zavras*, 94 F.3d 1399, 1403–04 (10th

Defendants present a number of legal arguments supporting their position that plaintiff's access-to-courts claims must fail, including qualified immunity, collateral estoppel, and a lack of actual injury to the plaintiff. (Defendants' Brief ("Def. Br.") at 3-18). This court will analyze the First Amendment claim as against each defendant.

### 1. Superintendent Connolly

Defendant Connolly was the Superintendent of Fishkill C.F. for the entirety of plaintiff's incarceration therein, from May 2012 until December 2013. (Dkt. No. 132-18 at 1). In a sworn declaration submitted in support of defendants' motion, defendant Connolly concedes that, upon initial entry into Fishkill C.F., plaintiff was permitted the use of an inmate scribe to "assist [plaintiff] with writing, including legal matters to the court." *(Id.)*. Defendant Connolly also concedes that, on August 3, 2012, plaintiff's license to use the assistance of an inmate scribe was rescinded. (*Id.* at 2). Defendants do not dispute that plaintiff was denied assistance from a scribe for the remainder of his confinement at Fishkill C.F. Nevertheless, defendant Connolly maintains that he is immune from liability for any alleged denial of access to the courts claimed by plaintiff because, among other reasons, he relied on the medical opinions of plaintiff's treatment providers, who determined that plaintiff had no medical need for the assistance of a scribe for writing.

---

Cir.1996) (no constitutional violation where, inter alia, prisoner had access to library "several hours every week"); *Auguste v. Dep't of Corr.*, 424 F. Supp. 2d 363, 369 (D. Conn. 2006) (no constitutional violation where prison permitted plaintiff to visit law library for one hour every other day and permitted plaintiff additional library visits sixty-three times during an approximately fifteen month period). Accordingly, plaintiff's access-to-courts claim based on a denial of access to the law library is factually and legally deficient, warranting dismissal.

It is well settled that "supervisors without medical training are entitled to rely on the medical expertise of their subordinates." *Dumont v. Corr. Corp. of Am.*, No. 2:14-CV-209, 2016 WL 8193639, at *8 (D. Vt. Nov. 21, 2016) (citing *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir. 2000); *see also Joyner v. Greiner,* 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) ("[A] prison administrator is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners . . .").  Although this premise is often cited in the context of prisoner deliberate indifference claims regarding medical care, the courts have recognized that such protections apply to supervisors who rely on the medical judgment of prison medical staff, for purposes of making day-to-day determinations regarding an inmate's confinement.  *See Williams v. Bailey*, No. 9:09-CV-0643 (DNH/DEP), 2010 WL 3881024, at *8 (N.D.N.Y. Sept. 3, 2010) ("The fact that [defendants] relied upon a medical clearance form signed by a prison doctor [in clearing plaintiff for work in the mess hall], without more, negates a finding [of liability]."), Report and Recommendation Adopted, 2010 WL 3843723 (N.D.N.Y. Sept. 28, 2010); *Cooke v. Stern,* No. 9:07-CV-1292 (GLS/ATB), 2010 WL 3418393, at *7 (N.D.N.Y. Aug. 2, 2010) (finding no liability for "members of the Program Committee" who assigned plaintiff to work in the mess hall because "they relied upon the judgment of the prison medical staff, which specifically cleared plaintiff for that job placement.").

The issue of plaintiff's physical condition and alleged paraplegia have been raised and argued in several of plaintiff's prior court actions.  At a minimum, plaintiff's prior lawsuits and the decisions flowing therefrom cast considerable doubt on the severity of

plaintiff's alleged limitations. *See Shomo v. New York Dept. of Correctional Services,* No. 9:04-CV-0910(LEK/GHL), 2007 WL 2580509 (N.D.N.Y. Sept. 4, 2007); *Shomo v. City of New York,* No. 03 Civ. 10213, 2012 WL 13128742 (S.D.N.Y. Aug. 23, 2012). Nevertheless, for the purposes of analyzing plaintiff's claim against defendant Connolly, it is sufficient to note that, at the time of plaintiff's transfer to Fishkill C.F. in 2012, his medical history contained conflicting reports of whether plaintiff suffered from paralysis of the upper extremities, and if he required assistance with activities of daily living.

When plaintiff arrived to Fishkill C.F. in 2012, he was placed under the care of various DOCCS physicians, including John T. Hammer, M.D. and Joseph Avanzato, M.D. (Dkt. Nos. 132-20 at 1; 132-22 at 1). According to Dr. Hammer's sworn declaration, plaintiff was placed in the long term care unit shortly after his arrival, "in order to evaluate plaintiff for general population within the correctional facility because [plaintiff] alleged he was unable to use his arms and legs." (Dkt. No. 132-22 at 2). By plaintiff's own admission, he was provided assistance with all activities of daily living at this time. However, in July 2012, plaintiff's treatment team came to the conclusion that "there was nothing neurologically wrong with [plaintiff] that . . . prevented him from using his arms and hands." (Dkt. Nos. 132-20 at 2; 132-22 at 2). This opinion was set forth in significant detail in a six page progress note prepared by Dr. Avanzato on July 12, 2012. (Dkt. No. 132-21 at 1-6). Dr. Avanzato included detailed support for his conclusion regarding plaintiff's medical condition, including an analysis of plaintiff's prior medical records, review of previous radiology and diagnostic testing, and anecdotal reports of plaintiff's voluntary limb movement. (Dkt. No. 132-21 at 1-6). Dr.

Hammer concurred with Dr. Avanzato's medical opinion, based on his own review of plaintiff's history as well as personal examinations. (Dkt. No. 132-22 at 2). Dr. Avanzato's medical conclusion was further endorsed by the subsequent medical opinion of neurologist Kishore N. Ranade, M.D.,a consulting physician for DOCCS. Dr. Ranade examined plaintiff in 2012, concluding that plaintiff was not a quadriplegic, and did not suffer from any disease that would prevent him from moving his extremities. (Dkt. No. 132-23 at 3). Based on Dr. Avanzato's conclusion, defendant Connolly discontinued the provision of a scribe to plaintiff, citing it as a "privilege" which plaintiff's disciplinary record no longer justified. (Dkt. No. 132-18 at 2-3).

This court recommends dismissing the First Amendment access-to-courts claim against defendant Connolly. As a lay prison administrator, he was entitled to rely on the judgment of the prison medical staff, which specifically opined that plaintiff had no limitations for using his upper extremities. *Cooke,* 2010 WL 3418393, at *7; *Williams v. Bailey,* 2010 WL 3881024, at *8. As the superintendent of Fishkill C.F., defendant Connolly was otherwise entitled to impose disciplinary policies that potentially affected plaintiff's access to the courts.[6] Nevertheless, the evidence reflects that plaintiff was

---

[6]The evidence of record reflects that between August 2012 and December 2013, plaintiff spent the majority of his confinement at Fishkill C.F. in keeplock, and was subject to other disciplinary consequences, as a result of his conduct. (Dkt. No. 132-8). "[A] practice that is reasonably related to legitimate penological interests must be upheld, even if it negatively impacts on prisoners' access to court." *Arce v. Walker,* 58 F. Supp. 2d 39, 44 (W.D.N.Y. 1999) (citing *Lewis,* 518 U.S. at 361). "Legitimate penological interests include preserving prison security and maintaining order and discipline." *Knight v. Keane,* 247 F. Supp. 2d 379, 393 (S.D.N.Y. 2002) (citing *Security and Law Enforcement Employees v. Carey,* 737 F.2d 187, 203 (2d Cir.1984)). Courts owe "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."

provided with an alternative means to prepare his legal memoranda, and there is no allegation that plaintiff's access to the courts was otherwise hindered by defendant Connolly throughout the remainder of plaintiff's incarceration at Fishkill C.F.[7] *See Desmarat v. Artus,* 2011 WL 1564605, at *5 ("While states must provide, at state expense, certain materials, such as paper and pen to draft legal documents[,] with notarial services to authenticate them, and with stamps to mail them[,] economic factors may nevertheless be considered when choosing the methods used to provide meaningful access. A state need not provide the best manner of access, nor is it obligated to equalize the financial resources of each of its inmates. . . So long as the State's procedure's [sic] meet constitutional minima, the courts should not second-guess them.") (internal quotations and citations omitted), Report and Recommendation Adopted, 2011 WL 1557914 (N.D.N.Y. Apr. 25, 2011).

### 2.    Defendant Martuscello

Plaintiff argues that he was still denied the assistance of a scribe upon his initial transfer to Coxsackie C.F. in December 2013, and for the following several months. Defendants argue that, without further analysis, defendant Martuscello is nevertheless

---

*Mitchell v. N.Y. State Dept. of Correctional Services,* No. 6:06-CV-6278, 2012 WL 6204205, at *9 (W.D.N.Y. Dec. 12, 2012) (citing *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003). The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton v. Bazzetta*, 539 U.S. at 132.

[7]At one point during his deposition, plaintiff stated that at Fishkill C.F. he "had no personal property available to [him], not a pen, no piece of paper, not legal work, not personal mail. I had nothing available to me." (Dkt. No. 132-3 at 38-39). The context of plaintiff's testimony, however, implies that plaintiff had "nothing available" because he was not being "assisted" with these items. (*Id.*).

subject to qualified immunity with respect to this claim.

In August 2012, Judge Alvin K. Hellerstein of the Southern District of New York issued a decision dismissing a prior lawsuit commenced by plaintiff, for allegations regarding the conditions of his confinement at a separate correctional facility. *Shomo v. City of New York,* No. 03 Civ. 10213, 2012 WL 13128742 (S.D.N.Y. Aug. 23, 2012). There, Judge Hellerstein made a specific finding that plaintiff had not demonstrated a serious medical need to satisfy his Eighth Amendment claims, particularly that "[t]he evidence, which is overwhelming . . . gives no medical support for [plaintiff's] purported paralysis." *Id.* at *4. Defendants argue that Judge Hellerstein's findings are controlling in the instant matter, and that defendant Martuscello is entitled to qualified immunity because federal law did not prohibit the defendants from denying the plaintiff a scribe during the time plaintiff was incarcerated at Coxsackie C.F. (Def.'s Br. at 9-11).

The court is not persuaded that summary judgment for defendant Martuscello is appropriate based on qualified immunity, particularly due to the nature of plaintiff's allegations against defendant Martuscello. Unlike the claim against defendant Connolly, plaintiff's access-to-courts allegations against defendant Martuscello are not limited to the scribe issue. Plaintiff also contends that defendant Martuscello personally censored plaintiff's legal filings, including what claims he allowed plaintiff to file and against whom he was allowed to file them. (Dkt. No. 82 at 47-48). Accordingly, Judge Hellerstein's previous determination that plaintiff was not paralyzed would not protect defendant Martuscello from the totality of the allegations against him.

The court therefore proceeds with its analysis of the access-to-courts claim

asserted against defendant Martuscello.  To be sure, plaintiff's First Amendment cause

of action is wholly premised on backward-looking claims.  Thus, plaintiff must allege

facts to plausibly suggest a nonfrivolous, arguable underlying claim that has been

frustrated by defendant Martuscello's actions, and a continued inability to obtain the

relief sought by the underlying claim. *See Johnson v. McKay*, No. 9:14-CV-00803

(BKS/TWD), 2016 WL 4047852, at *4 (N.D.N.Y. June 9, 2016), Report and

Recommendation Adopted, 2016 WL 4033199 (N.D.N.Y. July 27, 2016).  Plaintiff has

presented, in some detail, four previously pending causes of action allegedly dismissed

because he was denied access to the courts, and four other causes of action that plaintiff

"wanted to bring but was prohibited because of defendants['] denial of assistance." (Dkt.

No. 82 at 24).  Immediately, the court can dispose of three of the underlying claims, as

plaintiff does not allege that defendant Martuscello was personally involved in the

purported obstruction of these lawsuits.[8]  The court addresses the remaining underlying

---

[8]Personal involvement is a prerequisite to the assessment of damages in a section 1983 case. *Purdie v. Graham,* No. 9:09-CV-951(FJS/ATB), 2010 WL 6428487, at *3 (N.D.N.Y. July 14, 2010), Report Recommendation Adopted, 2011 WL 1258525 (N.D.N.Y. Mar. 31, 2011).  In 2006, plaintiff commenced a lawsuit with respect to alleged constitutional violations that took place at Wende Correctional Facility.  (Dkt. No. 82 at 23-24).  *See Shomo v. State of New York, et.al.,* No. 1:06-CV-00353 (W.D.N.Y.).  Plaintiff maintains that his ability to prepare certain paperwork in order to serve those defendants was obstructed by defendant Connolly's conduct while plaintiff was incarcerated at Fishkill C.F., resulting in a dismissal of that claim.  (Dkt. No. 132-3 at 89-90).  Because defendant Martuscello lacked any personal involvement in the alleged obstruction that occurred at Fishkill C.F., he cannot be held liable for an access action premised on this claim.

Plaintiff further alleges that, as a result of defendant Connolly's "denial of assistance with fi[l]ling out [a] notice of appeal" of Judge Hellerstein's previously discussed decision and order, that case was "terminated" with "no further action" available to the plaintiff.  (Dkt. No. 82 at 21-23).  Once again, the lack of defendant Martuscello's personal involvement in the alleged

causes of action in turn.

### a.     Plaintiff's Federal Habeas Corpus Claim

As previously discussed, plaintiff is currently incarcerated pursuant to his various felony convictions.  In his complaint, plaintiff describes in great detail the facts surrounding his underlying arrest, trial and conviction.  (Dkt. No. 82 at 3-18).  Included is the fact that, in April 2009, plaintiff became aware of a legal defect in the expert testimony elicited by the FBI, on behalf of the prosecutor, at his criminal trial.  (Dkt. No. 82-1).  Plaintiff maintains that this defect, among others, was a basis on which he could have brought a successive petition for habeas corpus in federal court.  (*Id.* at 11-12).  Nevertheless, plaintiff asserts that "because the Fishkill defendants 'refused' to allow anyone to even assist plaintiff in filling out legal papers, he was unable to fill out the application [for a successive petition] and return it [within] the 45 day time period."  (Dkt. No. 82 at 49).

Notwithstanding the foregoing, plaintiff does not assert a viable access-to-courts claim premised on his habeas petition.  Plaintiff fails to provide the dates on which he

---

obstruction of this underlying claim precludes a finding of liability against him.
    Last, plaintiff alleges that, in 1994 while an inmate at Riker's Correctional Center, he sustained injuries when he came into contact with "loose" electrical wires.  (Dkt. No. 82 at 19).  Plaintiff filed a Notice of Claim in 1996 against the city, and litigation ensued.  (*Id.* at 20-21).  Apparently, in light of plaintiff's 2000 conviction, the state court "informed plaintiff that the case would be taken off the active calendar, and all that would be need[ed] was for plaintiff to file a motion to restore the case to the active calendar."  (*Id.*).  Plaintiff, claiming that he spent the interim 12 years seeking counsel to represent him in the personal injury matter, apparently did not attempt to file the motion to restore the case to the active calendar until he was at Fishkill C.F., sometime after May 29, 2012.  (*Id.*).  Once again, plaintiff asserts that he was unable to return the motion to the court as a result of the "Fishkill Defendants[']" failure to provide assistance to plaintiff.  (*Id.* at 21-22).  By plaintiff's own account, defendant Martuscello had no personal involvement in the alleged obstruction identified, and as such cannot be held liable.

was provided the successive habeas corpus application or the date that the 45 day deadline expired, however he explicitly alleges that the "Fishkill defendants[']" actions prevented him from meeting the 45 day deadline. (*Id.*). As discussed, defendant Martuscello was the superintendent of Coxsackie C.F., and had no personal involvement in plaintiff's access to the courts while incarcerated at Fishkill C.F. Therefore, defendant Martuscello cannot be held liable for the obstruction of this claim.

Furthermore, plaintiff's access claim relative to his habeas petition cannot survive summary judgment because a searching review of the federal docket indicates plaintiff has, in fact, since moved for leave to file a successive habeas corpus petition. *See Shomo v. Zon,* No. 1:05-CV-10337 (S.D.N.Y.) (Dkt. No. 25); *Shomo v. Heath,* No. 1:12-CV-01974 (S.D.N.Y.) (Dkt. No. 7). Moreover, the Southern District denied plaintiff's motion, finding that plaintiff did not make a prima facie showing that the requirements of 28 U.S.C. § 2244(b) were satisfied. *Id.* Having already filed his successive petition and it being determined on the merits, plaintiff cannot now assert that he was foreclosed from seeking judicial relief in the underlying habeas proceeding.[9]

---

[9]It would also appear that plaintiff's claim is barred by the Supreme Court's holding in *Heck v. Humphrey,* as the award of damages in plaintiff's access claim would necessarily imply the invalidity of plaintiff's underlying conviction. 512 U.S. 477, 487 (1994). "In *Heck v. Humphrey*, [the Supreme Court] held that a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if 'a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence,' unless the prisoner can demonstrate that the conviction or sentence has previously been invalidated." *Adams v. Annucci,* No. 17-CV-3794, 2018 WL 4608216, at *5 (S.D.N.Y. Sept. 25, 2018) (quoting *Edwards v. Balisok,* 520 U.S. 641, 643 (1997)). Therefore, plaintiff cannot seek monetary relief based on his alleged wrongful conviction, because he has not shown that his conviction has been invalidated. See, e.g., *Antrobus v. City of New York,* No. 11 Civ. 2524, 2014 WL 1285648, at *3 (S.D.N.Y. Mar. 27, 2014) (citing *Hoard v. Reddy,* 175 F.3d 531, 533 (7th Cir.1999) (explaining why monetary damages are not available under *Heck* for an access-to-the-courts claim until after a prisoner's

### b.    Plaintiff's "Lost" Litigation Opportunities

The four remaining claims upon which plaintiff premises his access-to-courts action against defendant Martuscello are construed as potential § 1983 claims for constitutional violations imposed during plaintiff's incarceration at the various DOCCS facilities.  Specifically, plaintiff alleges that he "wanted" to, but was prevented from, bringing a claim against (1) Clinton Correctional Facility personnel for constitutional violations occurring between 2008 and January 2010 (the "Clinton C.F. claim"); (2) Attica Correctional Facility personnel for constitutional violations occurring between April 2010 and December 2011 (the "Attica C.F. claim"); (3) Sing-Sing C.F. personnel for constitutional violations occurring between December 2011 and May 2012 (the "Sing-Sing C.F. claim"); and (4) Fishkill C.F. personnel for constitutional violations occurring between May 2012 and December 2013 (the "Fishkill C.F. claim").

In premising his access-to-court claim on the aforementioned "lost" causes of action, plaintiff necessarily represents that defendant Martuscello's conduct was so severe as to "render [ ] hollow his right to seek redress . . . thereby completely foreclos[ing] a judicial remedy."  *Blake v. Dowe,* 36 F. Supp. 3d 271 (D. Conn. 2014) (internal quotations omitted) (quoting *Sousa,* 702 F.3d at 128).  Importantly, when the access claim "looks backwards. . . the complaint must identify a remedy that may be awarded as recompense *but not otherwise available in some suit that may yet be*

---

conviction has first been set aside)); *Holmes v. Grant*, No. 03 Civ. 3426, 2006 WL 851753, at *12–13 (S.D.N.Y. Mar. 31, 2006) (finding a section 1983 claim that the defendants caused dismissal of prisoner's habeas petition was barred by *Heck*).

brought." *Holmes v. Grant*, 2006 WL 851753, at *12 (emphasis added) (citing *Christopher v. Harbury*, 536 U.S. at 414-15); *see also Olivia v. Town of Greece, NY,* 71 F. Supp. 3d 368, 375 (W.D.N.Y. 2014) ("In other words, the critical issue here is whether or not the plaintiffs were 'completely foreclosed' from seeking a judicial remedy.").

The courts have suggested that the doctrine of equitable tolling presents such an alternative available means for a plaintiff to pursue his "lost" claims, at least in the context of habeas corpus relief. *See Hizbullahankhamon v. Walker,* 255 F.3d 65, 75 (2d. Cir. 2001) ("were we to determine, in an appropriate case, that the discretionary deprivation of a prisoner's access to his own legal materials and law library materials prevented a prisoner from petitioning for a writ of habeas corpus in federal court, we would be obliged to consider granting a request for equitable tolling . . ."); *Trombley v. Bosco*, No. 9:14-CV-01118 (JKS), 2016 WL 6238576, at *4-5 (N.D.N.Y. Oct. 25, 2016) (finding petitioner established an extraordinary circumstance warranting tolling of the one-year limitation period where the facility in which he was civilly confined had "no law library and that [residents were] not allowed access to computerized legal research"); *Holmes v. Grant*, 2006 WL 851753, at *13("[A]lthough plaintiff claims he is forever barred from pursuing his habeas petition, an alternative course of action with respect to this [access-to-courts] claim is to file his habeas petition and request equitable tolling in light of defendants' alleged destruction of his legal materials."). This court has not been presented with any reason why the same theory should not apply to plaintiff's "foregone" claims here, claiming unconstitutional conditions of confinement.

19

*See e.g. Borges v. Administrator For Strong Memorial Hosp.*, No. 99-CV-6351, 2002 WL 31194558, at *7-8 (W.D.N.Y. Sept. 30, 2002) (applying doctrine of equitable tolling to inmate plaintiff's deliberate indifference to medical needs claim).  This is especially compelling, considering that plaintiff has, since the inception of the instant access-to-courts suit, commenced a separate lawsuit in the Southern District of New York for the very same causes of action alleged in the underlying Sing-Sing C.F. claim, raising the doctrine of equitable estoppel.  *See Shomo v. State of New York, et. al.,* No. 18-CV-8523 (S.D.N.Y.) (Dkt. No. 1).  It is ,therefore, difficult to accept plaintiff's argument that he is "completely foreclosed" from seeking a judicial remedy in these matters.

Plaintiff's underlying claims prove otherwise fatal to his access-to-courts action against defendant Martuscello.  For example, according to the amended complaint, the statute of limitations for plaintiff's Clinton C.F. claim would have run no later than January 2013.  (Dkt. No. 82 at 24-25).  Plaintiff does not allege he was denied access to the courts by defendant Martuscello until his transfer to Coxsackie C.F. in December 2013, and as such there could have been no personal involvement by defendant Martuscello in obstructing his ability to file a complaint regarding the Clinton C.F. claim.

Furthermore, "delays in communicating with the courts or delays in the ability to work on a legal action do not rise to the level of a constitutional violation." *Murphy v. Feliciano*, No. 3:17-CV-269, 2017 WL 3698490, at *4 (D. Conn. Aug. 25, 2017) (quoting *Cathedral Church of The Intercessor v. Incoporated Village of Malverne*, 353

F. Supp. 2d 375, 388 (E.D.N.Y. 2005) (other citations omitted)); *see also Tanzi v. Town of Marlborough*, 13 Civ. 113 (GTS/RFT), 2014 WL 2815777, *5 (N.D.N.Y. Jun. 23, 2014) ("Conduct that merely delays a plaintiff's ability to work on a pending cause of action or communicate with the courts does not amount to a violation of the right to access"); *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995) ("A delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation"). The statute of limitations for the Fishkill C.F. claim would not have expired until December 2016, and plaintiff alleges that he began receiving assistance with writing legal papers as early as August 2015. (Dkt. No. 82 at 23). Moreover, he was transferred out of Coxsackie C.F. and into Wende C.F. by December 2015. To the extent that defendant Martuscello's alleged conduct amounted to a mere delay in plaintiff's ability to commence the Fishkill C.F. action, plaintiff has failed to allege actual injury for purposes of his denial of access to courts claim.

Based on the aforementioned, this court recommends granting summary judgment and dismissing the access-to-courts claim against defendant Martuscello.

**V.    <u>ADA/Rehabilitation Act</u>**

**A.    Legal Standards**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "To assure that those requirements are met, 'reasonable accommodation' may have to be provided to the

qualified individual." *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citations omitted).  Similarly, section 504 of the Rehabilitation Act declares, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Title II of the ADA and section 504 are applicable to inmates in state prisons. *Allah v. Goord*, 405 F. Supp. 2d 265, 274 (S.D.N.Y. 2005).  In order to state a claim under the ADA, the inmate must establish that: "(1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity [that] provides the service, program, or activity is a public entity." *Id*. (citations omitted).

The standards for an inmate's claim under section 504 are generally the same as an ADA claim. *See Id*. at 113 n.2 (the most significant distinction between the two statutes is that Title II of the ADA applies to all state and municipal governments, while section 504 applies only to those government agencies or departments that accept federal funds, and only those periods during which the funds are accepted); *Harris v. Mills*, 572 F.3d at 73.

### B.    Application

Plaintiff maintains an ADA and Rehabilitation Act (collectively "Acts") claim

22

against DOCCS[10] for the "denial of ADA accommodations."  (Dkt. No. 47-48).

Defendant raises the following challenges to plaintiff's claim:  First, defendants contend

that the doctrine of collateral estoppel bars plaintiff from litigating the issue of whether

he has a qualifying disability under the Acts.  Second, defendants argue that,

notwithstanding the application of collateral estoppel, plaintiff cannot meet his burden

to show he is a "disabled individual" within the meaning of the Acts.

"Under collateral estoppel, once an issue is actually and necessarily determined

by a court of competent jurisdiction, that determination is conclusive in subsequent suits

based on a different cause of action involving a party to the prior litigation." *LB on

behalf of PB v. Hines,* No. 15-CV-5238, 2018 WL 1773138, at *3 (S.D.N.Y. Apr. 10,

2018) (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)). "Collateral

estoppel, like the related doctrine of res judicata, has the dual purpose of protecting

litigants from the burden of relitigating an identical issue with the same party or his

privy and of promoting judicial economy by preventing needless litigation." *Id.* (citing

*Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979). Four elements must be

met for collateral estoppel to apply: "(1) the identical issue was raised in a previous

proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding;

(3) the party had a 'full and fair opportunity' to litigate the issue; and (4) the resolution

of the issue was 'necessary to support a valid and final judgment on the merits.'"

*Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *Interoceanica Corp.*

---

[10]To the extent plaintiff attempts to revive his ADA and Rehabilitation Act claims against
any individual defendants (Dkt. No. 142-2 at 7; Dkt. No. 150 at 3-4), these claims were
previously dismissed in my June 18, 2018 Decision and Order.  (Dkt. No. 81 at 21-23).

*v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997)).

Defendants correctly point out that the precise issue of whether plaintiff qualifies as a "disabled individual" under the Acts was previously litigated and decided on the merits by Judge Hellerstein, as set forth in his August 23, 2012 order, dismissing plaintiff's prior Southern District of New York ADA claim. *See Shomo v. The City of New York,* 2012 WL 13128742 at *7 ("The medical evidence indicates, for the reasons stated in Section V(A) above, that Shomo is not a "disabled individual" within the meaning of the [ADA and RA].").  Because the Southern District concluded that plaintiff did not suffer from a disability for the purposes of the Acts, that determination precludes plaintiff from mounting the same challenge in this court.  *See Cole v. N.Y. State Dep't of Corr. & Comm. Supervision,* No. 9:14-CV-0539(BKS/DEP), 2016 WL 5394752, at *31 (N.D.N.Y. Aug. 25, 2016) (finding Southern District Court's conclusion that plaintiff did not suffer from a hearing disability for purposes of the ADA barred plaintiff from litigating the issue of his disability in the pending action); *see also Moran v. N.Y. Dep't of Health,* 111 F.3d 123 (2d Cir. 1997).

Moreover, "a person alleging a disability protected by the ADA has a burden of establishing with medical evidence the existence of the alleged disability. . . ." *Fagan v. United International Insurance Co.*, 128 F. Supp. 2d 182, 186 n.2 (S.D.N.Y. 2001). Summary judgment is appropriate when a plaintiff fails to produce such evidence.  *See Sussle v. Sirina Protection Systems Corp.*, 269 F. Supp. 2d 285, 301 (S.D.N.Y. 2003) ("District courts in the Second Circuit have repeatedly held that a plaintiff's personal testimony which describes the alleged limits that affect a major life activity, 'without

supporting medical testimony, simply is not sufficient to establish [a] prima facie case under the ADA.").

Here, plaintiff cannot satisfy his burden to show that he is a "disabled individual" within the meaning of the Acts. As previously discussed, the medical evidence proferred by defendants in the form of Dr. Avanzato, Dr. Hammer, and Dr. Ranade's sworn affidavits overwhelmingly contradicts plaintiff's allegations of paralysis. These medical affidavits are consistent with Dr. Avanzato's lengthy analysis of plaintiff's medical condition, prepared contemporaneously with the time period in dispute. Plaintiff, in an attempt to argue that a question of fact remains with respect to his disability status, relies on the May 2012 Mount Vernon Hospital records "where he was diagnosed as a quadriplegic." (Dkt. No. 150 at 5). These records consist of a physician progress note and physical therapy evaluation prepared when plaintiff was transported to Mount Vernon Hospital to treat for his reported hunger strike while at Sing-Sing C.F. (Dkt. Nos. 82-1 at 207-209; 142-1 at 11-15). Although the term "quadriparesis" appears in the history section of plaintiff's records, the physician's progress note merely concludes with an assessment of "Quadriparesis *by history.*" (Dkt. No. 142-1 at 15) (emphasis added). Plaintiff's subjective complaints and reports of paralysis do not rise to the level of a disability under the Acts, and plaintiff cannot satisfy his burden in this regard.

Plaintiff argues that, notwithstanding a lack of medical evidence supporting the his alleged paralysis, he is nevertheless entitled to the protections of the Acts because he was "regarded as having such an impairment" by DOCCS personnel during the period in

25

question.  Admittedly, the ADA Amendment Act of 2008[11] alternatively defines a

"disability" as "being regarded as having such an impairment [that substantially limits

one or more major life activities.]" 42 U.S.C. § 12102(1).   However, the ADAAA now

makes clear that no failure to accommodate claim can be made, as a matter of law, for an

individual who was "regarded as" disabled, rather than who was actually disabled.  "In

other words, the "regarded as" theory of disability is no longer actionable in the context

of a failure to accommodate claim."  *Graham v. Three Village Central School Dist.*,

2013 WL 5445736, at *11 (citing 42 U.S.C. § 12201(h) ("A covered entity under

subchapter I, a public entity under subchapter II, and any person who owns, leases (or

leases to), or operates a place of public accommodation under subchapter III, need not

---

[11]

The ADA Amendment Act of 2008 ("ADAAA"), effective January 1, 2009, altered the analysis for assessing ADA disability claims, "substantially broaden[ing] the definition of a disability under the law, in explicit response to *Sutton v. United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002), in which the ADA's terms defining disability had been strictly defined." *Green v. DGG Properties Co.*, Inc., No. 11–CV–1989, 2013 WL 395484, at *9 (D.Conn. Jan. 31, 2013) (citation and internal quotation marks omitted); *see also Kravtsov v. Town of Greenburgh*, No. 10–CV–3142, 2012 WL 2719663, at *10 (S.D.N.Y. July 9, 2012) ("In enacting the ADA, Congress intended to provide broad coverage for individuals with disabilities, and in enacting the ADAAA in 2008, rejected Supreme Court precedent in *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002), as interpreting the term 'substantially limits' to require a greater degree of limitation than was intended.") (alteration, citation, and internal quotation marks omitted)). Thus, "[w]hile the terms of the statute were not changed, the interpretation of those terms was modified." *Brtalik v. S. Huntington Union Free Sch. Dist.*, No. CV–10–0010, 2010 WL 3958430, at *7 (E.D.N.Y. Oct. 6, 2010). Pursuant to this definition, an asserted "disability" will "be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of the chapter." 42 U.S.C. § 12102(4).

*Graham v. Three Village Central School Dist.*, No. 11-CV-5182, 2013 WL 5445736, at *11 (E.D.N.Y. Sep. 30, 2013).

provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of such section.")); *see also Morris v. Town of Islip,* No. 12-CV-2984, 2014 WL 4700227, at *8 (E.D.N.Y. Sept. 22, 2014) (quoting *Powers v. USF Holland, Inc.,* 667 F.3d 815, 823 n. 7 (7th Cir. 2011) ("[T]he ADAAA clarified that an individual 'regarded as' disabled (as opposed to actually disabled) is not entitled to a 'reasonable accommodation.'")). Thus, even assuming plaintiff was, for a time, "regarded as" disabled by DOCCS, he was not entitled to a reasonable accommodation under the Acts.

## VI. <u>Sanctions</u>

Plaintiff has requested that the court impose sanctions on the defendants for their asserted failure to respond to discovery demands, as well as spoliation of evidence. Although these requests[12] should be moot in light of our recommendation to grant

---

[12]Inasmuch as plaintiff is seeking relief that is separate and distinct from the issues raised in defendants' pending motion, plaintiff's various sanctions requests should have properly been asserted by way of cross-motion, instead of tacked on to the end of plaintiff's memorandum of law and sur-reply in opposition. However, plaintiff also requests in his opposition papers that the court reopen discovery in order for him to obtain additional documentation, in particular various transcripts relative to his December 2012 hearing regarding the state's request for an order to force-feed plaintiff. (Dkt. No. 150 at 1-2). To the extent plaintiff seeks relief under Rule 56(f), we further recommend denying the same. Plaintiff admits that these transcripts, at most, include the state's request to withdraw their 2012 state court petition to force-feed plaintiff, and its concession that the court stop short of determining plaintiff's status as a quadriplegic. (*Id.*). Even assuming the validity of plaintiff's contentions as to the contents of the transcripts, such evidence is not relevant to the instant motion and would not affect this court's recommendation. *Hodge v. Perilli,* No. 06 Civ. 2480, 2010 WL 291058, at *11 (S.D.N.Y. July 12, 2010) (citing *Sage Realty Corp. v. Insurance Co. of North America,* 34 F.3d 124, 128 (2d Cir. 1994))(noting that to obtain Rule 56(f) relief, additional discovery sought must be material to opposition of the summary-judgment motion).

defendants' summary-judgment motion and dismiss the amended complaint, we also separately recommend that plaintiff's motion for sanctions be denied even if the court were to deny some aspect of defendants' Rule 56 motion.

When determining the proper sanction for discovery infractions, we must consider "(a) [the] willfulness or bad faith on the part of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party has been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party." *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124,138 (S.D.N.Y. 2009) (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir.1998)).  Plaintiff first complains that the defendants have been 'evasive' and 'misleading' in responding to various demands for admissions asserted by the plaintiff.  (Dkt. No. 142-2 at 9-15).  However, Plaintiff's request for sanctions regarding defendants' allegedly insufficient discovery responses has already been considered by this court, and denied in my January 30, 2019 text order. (Dkt. No. 129). Plaintiff presents no new basis for his discovery sanctions request, therefore the court will rely on its prior denial of such relief.

Second, plaintiff alleges the defendants' "spoliation" of evidence.  (Dkt. No. 142-2 at 15-17).  Although unclear, the court interprets the allegation to be that defendants improperly destroyed certain videos of plaintiff depicting images "consistent with plaintiff being a quadriplegic." (*Id.* at 15).  Pursuant to Rule 37 of the Federal Rules of Civil Procedure,"[i]f electronically stored information that should have been preserved in the anticipation or conduct  of litigation is lost because a party failed to take

reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the Court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may;

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). As the language of the revised rule[13] makes clear, the Advisory Committee "adopted the principle that severe sanctions are permitted only where the court finds an 'intent to deprive another party of the information's use in the litigation[.]'" *CAT3, LLC*, 164 F. Supp. 3d at 495(quoting Fed. R. Civ. P. 37(e)(2)).

At the outset, plaintiff fails to give any detail as to the date, location, or content of the videos for which he seeks spoliation sanctions. To the extent plaintiff argues that DOCCS should have preserved the video that was allegedly produced for his December 2012 state hearing on the force-feeding petition, there is no evidence to support an inference that, once the Order to Show Cause was determined, any video evidence of

---

[13]This rule underwent substantial revision as part of a series of amendments to the Federal Rules that became effective on December 1, 2015. *See CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 495 (S.D.N.Y. 2016). Prior to these amendments, "the Second Circuit permitted [spoliation] sanctions upon a finding that the party that had lost or destroyed evidence had acted negligently." *Id.* (citing *Residential Funding Corp. v. DeGeorge Capital Corp.*, 306 F.3d 99, 108 (2d Cir. 2002).

plaintiff should have been preserved because it would be requested by plaintiff in a future, unrelated legal proceeding commenced several years later.  Moreover, plaintiff has not presented any evidence beyond his unsworn, self serving statements indicating that the defendants destroyed video of the plaintiff with the intent to deprive him of its use in this litigation.  Accordingly, and in light of this court's recommendation to dismiss the complaint, plaintiff has not presented a justification for spoliation sanctions against the defendants.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 132) be **GRANTED,** and it is further

**RECOMMENDED,** that plaintiff's motion for sanctions be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: October 7, 2019

Hon. Andrew T. Baxter
U.S. Magistrate Judge